Good morning. This morning, we only have three appeals to hear. Counsel, we're familiar with your cases. We've read your briefs, the authorities cited in your briefs, at least have a lot of time this morning. Feel free to get straight to the heart of your argument. We're probably going to have some questions, but don't treat the red light as aspirational, please, when it shines. Obviously, if you answer a question from the court, you can finish your answer, but do be mindful of our time. United States v. Bell, Mr. Shamagin. Thank you, Chief Judge Breyer. Thank you, Mr. Shamagin. I apologize for repelling you. May I please ask the court, what is the government's theory of criminality in this case? The defendants operated a currency exchange business that bought and sold Iraqi dinars at agreed-upon prices. My client, Mr. Bell, never made any representations about the likelihood of a mail-on-wire fraud, conspiracy, and making false statements to federal agents. This court should now reverse or vacate Mr. Bell's convictions. As to mail-on-wire fraud and the attendant conspiracy count, the government failed to present any evidence that defendants intended to deprive another person of money or property because any deception did not go to the benefit of the bargain. At a minimum, the jury instructions failed to require a determination that the I will address that issue on behalf of all three defendants this morning. As to false statements, the government failed to prove that any of Mr. Bell's statements were materially false or misleading. Those statements were fundamentally ambiguous. And at a minimum, the statements were readily susceptible to truthful interpretations, and the government failed to negate them. Finally, as to all of the convictions, the district court ordered to permit the jury to view a highly prejudicial video about an unrelated prosecution. And so this court should either reverse the convictions outright or remand for a new trial. I'd like to start with the issue of mail-on-wire fraud. This court is well familiar with its precedents in this area, but at a minimum, the district court here failed properly to instruct the jury concerning an intent to deprive someone of money or property. Let me start with the instructional issue. Now, I think there is some common ground here between us and the government. The government seemingly concedes at a minimum that an intent to deprive someone of money or property is required. And second, the government seemingly concedes, with one caveat which I'll get to in a minute, that an intent to deprive cannot be shown if the deception does not go to the nature of the bargain. Instead, the government's primary argument here is that the government seeks to broaden what the bargain is here. The government really seems to try to... Well, it seems to me maybe our precedents do that. So the characteristics of the good are not narrowly limited to its physical properties or authenticity, it seems to me. And the deception doesn't need to have a calculable price difference or result in a different tangible good or service to constitute fraud. If you look at the Dyn-Electric decision, for example, and the examples the government gives about sweepstakes fraud and lying about the availability of Well, Chief Judge Pryor, I'm well aware of your views on this issue, and I'm well aware of the fact that this Court has, in some cases, held that certain aspects of transactions take them outside the rule of Takala. And in particular, I would acknowledge the Wheeler and Watkins cases, which I think are really... Wheeler is another, yes. I think those are really the primary cases on which the government relies. And let me explain why they are different, and in the course of that, I will address some of the hypotheticals that you mentioned. In both Wheeler and Watkins, what you had was defendants making misrepresentations about a company in circumstances in which what they were selling was stock in the company. So, for instance, in Wheeler, you had a defendant lying about a company's profitability, associations between the company and a famous executive, and so forth. Really, the misrepresentations in Watkins were to the same effect. The problem for the government here is that what is being sold is not stock in a company. What is being sold here is a currency. And really, the fundamental disagreement between us and the government is that we say that what is being sold here is dinars. What they say is that what is really being sold here is an investment with particular expected returns. Now, there are all sorts of problems with that. I would submit that the fundamental problem with that is that they are primarily relying on things that Mr. Keller, the guy who ran the Geteam website, said. Mr. Keller, of course, was acquitted, but even leaving that to one side, there is no reason why anyone would think that a representation made by Mr. Keller went to what it was that Sterling was selling. And so, when we talk about what the bargain was here, the bargain was solely for dinars. But why would anyone buy large amounts of dinars in the volume that people bought here, other than to make a profit from them eventually? They would of course buy them in the hopes that dinars would go up. And so, we would certainly acknowledge that the purpose, the motive for purchasing dinars was, in many cases, in the hope and expectation that the price would go up. But the fact remains that the bargain here was solely for dinars. And it was not for dinars plus something else. The government's other theory here is that part of the bargain was these airport exchanges. But the reason why this case is different from the government's preferred hypothetical, the hypothetical of the Toyota service contract, is that those airport exchanges were open to the public. And so, even leaving aside the fact that there was no evidence that appellants lacked intent to open those exchanges, the fact remains that this was not a circumstance in which the defendants were selling dinars plus something else. Can I ask you to address something that has been bothering me? So, here the allegations from the government is that the lies were about the likelihood of a revaluation. What if the government said, in a different case, the lie was that a revaluation had already happened. So, someone is selling dinar and they're saying, look, the Iraqi government accepts this. It's been revalued. But we'll sell it to you for, you know, five cents a dinar. Would that go to the benefit of the bargain? So, that's an interesting question, Judge Brasher. Of course, you know, the thing about the dinar is that the rate was, of course, set by the government. And, you know, I believe that that was a sort of publicly known rate. So, it's a little bit of an artificial hypothetical for that reason. Well, it's a hypothetical, so it's necessarily artificial. No, but I think, you know, I think what makes it a little bit difficult is that in this circumstance, you know, I think everybody knew what the government rate was. And the dinars were being sold, obviously, with a commission on top, both by our clients and by others. And so, I suppose that in that circumstance, maybe you could have a circumstance in which there was really deception that goes to the price, which is really the fundamental question. If you fooled somebody into thinking that the price was something other than what it, in fact, was, you know, you would essentially be, for instance, lying about what your commission was because the actual value of the dinar was different. Yeah, but I guess that's, I guess that's the issue that I'm having is that if you're saying, is your argument, I think, is that, look, they got the currency that they wanted and any lies that were told in that process didn't go to the benefit of the bargain because they got the pieces of dinar that they wanted. Wouldn't the same thing, wouldn't this exact same argument follow through to a lie that is not a future-oriented lie, which that's sort of a different, I think, problem. I think the answer would ultimately still be no, that there would be no fraud. And I think the closest analog are the cases that were litigated, in which I was involved in the Second Circuit, where you had bond traders arguably making misrepresentations about the size of the commission. But the fundamental argument was, you're still getting what you paid for because you know what you're paying and you know what you're getting. You're getting the dinar. So, I think the outcome would be the same. But ultimately, you know, our fundamental submission here is that what makes this case different from all of the cases that this court has previously considered is, again, that there's no sense in which what you're buying here is, you know, a corporation. What you're buying here is not a share of the Iraqi government. But it is more like a lottery ticket. I mean, there's an investment value and if you tell the buyer there's a one in a hundred chance of hitting the jackpot when, in fact, there's a one in a million chance, that's a scheme to defraud, isn't it? But there you're fundamentally misrepresenting the characteristics of the court. Yeah. Here you're not fundamentally doing that. Well, and that's... Let's say I'm selling GameStop stock to somebody. Let's say I sold you GameStop stock and I said, you know, I think this stock is going to go up. You would be getting exactly what you bargained for. You would be getting merely, you would merely be hearing my opinion that this stock might go up and, of course, the stock might also go down. But see, isn't that a separate issue though, I guess? And because, and just, you know, there's a lot of stuff that the government has to prove to prove one of these frauds. It seems like that issue goes to materiality. It goes to whether it's a fact or an opinion. It goes to sort of other things. It doesn't really go to this benefit of the bargain issue that's in Taklov. It seems like the benefit of the bargain issue is more about how ancillary the lie is to the transaction that's going on. I don't think that that's really the question. And the way that this court has framed it, not only in Taklov but successor cases, is to frame it in terms of whether or not it's ancillary. What the government wants you to do is to say that anything that relates to the good qualifies as, falls outside the Taklov standard. And our submission is that that leaves very little room for Taklov. And I want to say that if you disagree with this or if you think that there is uncertainty about any of this, the straightest line here is simply to vacate based on the instructional error. And I think that whatever you think about Taklov, an enigma of the pattern jury instruction should have been given here because of the failure to include the critical second sentence that we've proposed, the language that says that proving intent to deceive alone is not sufficient to prove intent to defraud. And that is really the key. The government, I think, recognizes, even though we disagree about scope, that there has to be an intent to deprive someone of money or property. And at a minimum, the jury should have been allowed to determine these questions concerning the scope of the bargain, the scope of what it was that the customers were bargaining for, whether it was just for dinars or whether it was for an investment with particular expected returns. And again, whatever you think about Taklov, there is no doubt that an intent to deceive without an intent to deprive someone of money or property is insufficient. I would also note very quickly that, as this Court may be aware, in the Coussis case, the Supreme Court has granted review to consider issues that are, at a minimum, closely related to the issues here. I think the theory in that case on the part of the defendant appears to be somewhat different. But the Court is going to consider the extent to which fraudulent inducement can support or bail a wire fraud conviction. And so I think if the Court had any doubt here, though I do think the Court can say that the instruction was insufficient, regardless of the exact scope of the Taklov rule, I think that the Court could certainly wait for the Supreme Court's decision. Because my time is short, I do want to spend a couple of minutes on the false statements convictions. I think here our submissions are very straightforward. Mr. Bell, on the Robin statements, said that Sperling maintained a firewall with unnamed promoters and that she told promoters that their job was not to drive or direct business to Sperling. We think that those statements are fundamentally ambiguous as a matter of law, which calls into doubt the falsity of the statements and Mr. Bell's intent in making them. And while the government attempts to draw a distinction between fundamentally ambiguous questions and fundamentally ambiguous answers, in both of those circumstances, I think that there is a very real concern that the jury cannot possibly determine whether the defendant made a false statement because the jury would have to speculate about what the defendant was conveying or thinking. Isn't firewall, though, I mean, I mean, it just seems like a fairly, I mean, just the definition of firewall is a strict separation, right? Well, the agent himself testified that he wasn't sure what was meant. But I think the jury cannot mean that. And it's not entirely clear to me, parenthetically, what the government thinks Mr. Bell was meaning. I would invite you to ask Ms. Prout when she gets up here, you know, what exactly the government's theory was. But it can't be that there was no communication. And the reason why we know that that is true is that on both of the occasions that the statements at issue were made, Mr. Bell explicitly said right before the allegedly false statements that Sterling had an advertising relationship with the Get team, with other DENAR promoters. And so I think by far, the more natural understanding here is that Mr. Bell was simply conveying that Sterling did not seek to influence what the Get team or other DENAR promoters said about the potential revaluation of the DENAR. I think when you read the statements in context, it's quite clear that Mr. Bell's concern was that he didn't want Sterling to be implicated in these statements hyping the DENAR. And it's for that reason that Bell told Sterling employees not to give customers investment advice and why Sterling itself said the customers should be wary of salacious rumors. Sterling took great pains to distance itself, and that was a better understanding. And again, on this issue, at a minimum, you know, we should be entitled to a new trial here. The government has failed to introduce substantial evidence of the statement's falsity. I'll leave the issue of the Huebner video to my friend, Mr. Buckholz. Thank you. Thank you, Mr. Shammigan. You've saved four minutes. Mr. Marcus. May it please the Court. My name is David Marcus, and I represent Tyson Rehm. My colleague just addressed the issue of the second prong of wire fraud, the intent to defraud. I'd like to address the first prong, the intent to deceive, because Mr. Rehm and the other defendants did not intend to deceive, did not conspire to deceive anyone. The prosecution relies on three supposed lies, the promised imminent revaluation, the layaway program, and the airport exchanges. But the Sterling defendants never promised an imminent revaluation. And I think this is really important. The government even admitted to it in its closing. The district court said at the close of the evidence that he couldn't say that the Sterling defendants told consumers it would be worth any more than what they sold it for. And the strict corporate policy, of course, of Sterling was not to say there was an imminent revaluation. There's numerous citations in the record to this. So what is the prosecution? They pointed to two exhibits. One is 1A and the other is 10D for support that Sterling promised this imminent revaluation. 1A was an article that briefly appeared on the website back in 2009. No witness said they saw it. And that's really critical. Not one witness at the trial said they saw exhibit 1A. And if you look at 1A, all it says is that there was speculation about whether it would go up, that it would be slow and even worse. 10D was not on Sterling's website. It was an email from Mr. Rehm to a customer where he said he was baffled by the rumors and to be careful about speculation. Each and every customer that was called at trial said they did their own research. They had bought Denar before ever coming to Sterling. And there was no issues from Sterling. They pointed, of course, to Keller and the Get team. And this is really important because Sterling did not conspire or agree with Mr. Keller to make false promises of revaluation. Of course, it's not determinative, but Keller was acquitted. Didn't Rehm write an article for the Sterling website that predicted a sudden significant high revaluation? Note, Chief Judge Pryor, that the exhibit you're pointing to is 1A. It was an article that was briefly on the website. He talked about that it would be speculation to say it would go up. He did say that he thought there would be revaluation, but that it would be slow and steady. And this is really important because in the government's closing at 4670, the government distinguishes between promises of revaluation and imminent revaluation. There is nothing wrong, according to the government, of saying this thing might go up. That happens every day. The problem, they say, is that it's going to go up tomorrow or it's going to go up this weekend. And that, the Sterling defendants never did. They also never made any false promises about the layaway program. And this is, again, pretty important because the layaway program gave everybody exactly what was promised, an option to buy. They would put money down and they had an option to buy it. Some exercised, some did not. Even people they point to, like J.R. Hill, who made 250 layaway purchases, they say he's a victim. Why tell the investors that Sterling planned to open the physical kiosk at airports around the country if not in promotion of the misrepresentation that there's going to be a sudden revaluation? Well, I think the sudden part is important there. They were planning on it. They spoke about it in their offices. There was a witness, Dina Manso, at 4443 and 44, who says that it was spoken about often in the office about how to do this as the customers But they never planned to do that. I disagree, Your Honor. So as the customers went up, the Sterling defendants changed the program, the airport exchange program, saying who would qualify and who would not qualify. These were pilots that could fly and meet them at a conference room and change the DINAR. They were planning on it. And as, again, their customers grew, very few people qualified because they said you had to have five million in DINAR and other things. That disqualified almost everyone. A couple last points because I have very little time left about the false statement counts. The false statement counts were intertwined with the wire mail fraud. The government intertwined them, and that's why, for example, if there's a new trial because the instruction given was wrong on TAKLOF, which it was wrong. There was no—the pattern wasn't given. There should be a new trial on the false statement counts as well. For example, in closing, the prosecution said that they're going to show Mr. Rame's wrongdoing of fraud through his lies. That's at 4704. At 4708, they said he was caught committing massive fraud, and therefore he lied. So they tied the supposed false statements to the fraud. And so under cases like Reddy and other cases that we cite, when they're tied together like that, if there's a new trial on the fraud, there too should be a new trial on the false statements. And so when an instruction, for example, on the fraud is wrong, everybody agrees that they were not given the pattern instruction. It was wrong, the instruction the jury got. And a new jury should be able to consider all of the counts together, especially when the government itself tied the false statement counts to the fraud counts. Those six minutes went fast. I will say as I sit down, I've been before this court a lot with a lot of different defendants. Mr. Rame is different. This case is different, Your Honor. He deserves a new trial on this case. Thank you, Mr. Marcus. Mr. Buchholz. Good morning, Your Honor. I'm going to release the court, Jeffrey Buchholz, for Mr. Jim Shaw. I'd like to focus on two issues here, but briefly allude to a third. The two I want to focus on are, as Mr. Shammugam said at the outset, the government's admission and use of four exhibits for the purpose of, quote, unquote, notice, as opposed to the hearsay purpose of what they said. And then the sufficiency of the evidence of deceit, even putting aside the distinction under Togolov between deceit and fraud, as to my client, Mr. Shaw. I'll start with the, quote, unquote, notice exhibits. Here we're talking about four things. So first and foremost, the CNBC video about the prosecution of Brad Huebner. And then also a Forbes article, a blog post by somebody calling themselves Nutrition Dude, and a document that was reported to be from Bank of America. The Huebner video was hugely important, Your Honor. This is a professionally produced, flashy, vivid video that has AUSAs on camera being interviewed about the prosecution of somebody else not affiliated with Sterling for doing things that Sterling is not alleged to have done, like selling shares in a hedge fund that didn't exist. And the jury saw that. The jury sat through a long trial, probably a lot of dry evidence, a lot of stuff that was hard to follow, technical. And then they saw this video. The government says it was only four minutes in a long trial. Well, right, but it was the most vivid, memorable four minutes of a long trial. And the government touted this video in closing. So I don't think they can really come now and say that this video was no big deal. They argued very strongly for its admission and argued very strongly against a mistrial motion after the judge seemed to have some second thoughts about whether he should have let it in. It was not relevant for the supposed non-hearsay purpose of notice because it wasn't about Sterling. It wasn't about these defendants. It was about somebody else who did different things. And it was extremely prejudicial. And the government clearly wanted the jury to take the top-line message that was blared across the screen in big letters, Dinara's scam. But the defendants were aware of these, right? I mean, there was evidence that they were aware of this coverage, right? And as I understand it, the government's argument was that awareness is what shows their intent. That was the government's argument. Here's why that doesn't work. So first of all, there was zero evidence that anyone other than Mr. Bell ever even saw this video. So this video was clearly not evidence of notice as to anyone else. Didn't they email links or attachments of these reports to each other? Your Honor, I'm only talking right now about the CNBC Huebner video. It was undisputed that the only— You had brought up some of the others too. So there was a Forbes article, right? Right. I'm sorry. I was trying to answer your question about the Huebner video. That was not evidence even according to the government of notice as to anyone other than Mr. Bell. So my client never saw that video. There's no evidence that he saw it, heard about it, knew anything about it. And it was extremely prejudicial to him for the jury to see this video about people doing something superficially similar, selling Dinara's, with federal prosecutors on camera saying that they went to jail for a long time. That should not have been admitted, and it was extremely prejudicial. The other exhibits, Your Honor, Chief Judge Pryor, to answer your question about the Forbes document, the government also argued that very strongly, specifically as to my client. I think the admission of all of these documents was erroneous and prejudicial as to all the defendants. But as to Mr. Shaw in particular, here's what the government said at 24-11 in arguing for admission of the Forbes document. The government said we're paying close attention to which defendant we have evidence against for Rule 29, and I don't think we're there yet with Shaw. That's why the government said they needed the Forbes article. Well, the Forbes article wasn't notice, wasn't evidence of notice of anything meaningful, anything real as to Mr. Shaw. The Forbes article was filled with statements that were incorrect, and it wasn't about Sterling, it wasn't about Mr. Shaw. It was extremely prejudicial, and it really wasn't relevant. And if it was irrelevant, even the tiniest bit, that was far outweighed by its prejudicial impact. And the government argued that they needed that as to Shaw. So, again, they can't now come and say, well, it really wasn't a big deal. It didn't matter. Same thing with Nutrition Dude. This is Exhibit 262A. This is a blog post. We have no idea who wrote it, no idea who Nutrition Dude is. For all I know, it's a bot, and the government never identified it. The government argued at 32-42 that they needed Nutrition Dude in order to tie what happened in the Get Team conference calls to Mr. Shaw. The government said we've had very limited evidence. Shaw was aware of what happened in the Get Team calls. In this evidence, Nutrition Dude goes to show it. Same thing with page 31 of the government's brief, where the government tries to say Mr. Shaw joined the conspiracy. He's on the hook for what happened in the Get Team conference calls. The only thing they cite is Nutrition Dude, as if Mr. Shaw was supposed to care, take seriously what some unnamed blogger named Nutrition Dude said. If your honors read that exhibit, you'll see that it's full of nonsense. It's full of innuendo. It's full of insults. It's not about Sterling. So no prejudicial value there. Mr. Shaw, the distinction between deceit and fraud under TACOLAB is an important issue for all the defendants here. But even putting that distinction aside, your honors, there's no sufficient evidence that Mr. Shaw deceived anybody or agreed with anybody to deceive anybody. The government relies on things that have no probative value as to Mr. Shaw joining any conspiracy, like that he was responsible for Sterling's banking relationships. Mr. Shaw had no contact with customers, didn't say anything to anybody that was a misrepresentation. If nothing else, your honors, the court should reverse that to everybody. But if nothing else, the court should hold there was no sufficient evidence as to my client, Mr. Shaw. I see my time is up. If your honors have no further questions, thank you very much. I don't think so. Thank you, Mr. Ruckels. Ms. Prout. Good morning. May it please the court. Allison Prout for the United States. I want to address first the sufficiency arguments that were raised by the defense as far as the benefit of the bargain. And I think the court's questions were very much aligned with the government's view of this case in that the victims in this case bargained for an investment that was going to skyrocket in value and that they would be able to exchange for dollars after that occurred. I think the two arguments that I heard from the defense were first, the airport exchanges were open to the public, and so they couldn't have been part of the bargain. First, as a matter of the record, that is incorrect. There was evidence in the record, including government's exhibits 110, 115, 116, and 122 in which Defendant Rehm told customers specifically that customers would be given priority on all appointments and exchanges. And this came up because customers were constantly reaching out to Sterling employees asking, can I go to this airport? Can I go to that airport after the RV? And so, first of all, the evidence showed that customers would get priority. It also showed that customers were specifically buying these dinars from Sterling because they believed they would have access to that exchange. Second, the argument that I heard from defense was that there's something different about the dinar because an exchange rate is set by the Iraqi government. This, too, is not a reason to differentiate this from the run-of-the-mill investment fraud scheme. To begin with, that, too, is incorrect. There was an exchange rate set by the Iraqi government, but we know that the defense charged the fee every time the dinar was exchanged. And although that fee was somewhat obscured because it was built into the exchange rate that Sterling charged, we know this if only from the fact that the evidence showed that Sterling netted approximately $200 million in profit from this business. And that's because they were charging a fee for this exchange. That's the whole reason they were in this business and that they committed this fraud. At any rate, even if it were the case that the exchange rate was set by the Iraqi government, if you have somebody who's telling lies about the value of that exchange rate, it could still satisfy the requirements for fraud and be a misrepresentation. What the defense is really suggesting is that the victims here shouldn't have reasonably relied on those representations, but that's not a requirement for fraud. I'm wondering whether there is there any distinction between selling the currency as an investment and misrepresenting the possibility of a revaluation. I think in this, well, our position is no. They sold the currency as an investment. That's clear from the record. And customers clearly had an expectation based on the lies of both Sterling and Mr. Keller that it was going to revalue. Even if the customers were buying this dinar because, say, they wanted to travel to Iraq and make purchases with it, which there was no evidence that anyone did that, but even if that were the case, the fact that the defendants were telling lies of that nature, that's the inquiry that's relevant here. As the Svet case instructs, the determination for a scheme to defraud is the intent of the defendant. And here it's clear that the defendants were representing the dinar as an investment that was going to skyrocket in value. Turning to the jury instruction question, what I heard from the defense is that they're most troubled by the fact that the second of the three supplemental sentences that they requested were not given. The question of whether a supplemental instruction should or should not have been given should be reviewed for abuse of discretion and is subject to a three-prong analysis. It's the government's contention that the defense's requested instruction fails on the first prong and the third prong. The first prong is the correctness of the instruction. And here the Waters case is squarely on point. In Waters, the defense was making similar nature of the bargain arguments. It was a loan case. They requested very similar instructions about the nature of the bargain. And in that case, this court determined that it was not error, it was not an abuse of discretion to decline to give the requested instruction because the requested instruction was incomplete and misleading. And the same problem was present here. What the defendant's requested instruction did here was they sought to tell the jury all the ways that things can not be a scheme to defraud. And in particular, the second sentence that they've highlighted, this is what they requested. Merely inducing someone by means of a trick or deceit to enter a transaction that he or she otherwise would have avoided is insufficient to show fraud. Now, this begs the question, by saying merely inducing someone by means of trick or deceit, well, then what is required? And the instruction that was not part of their requested supplement was the instruction on the nature of the bargain. Because if there were an intent to defraud, that would be because the customer did not receive the nature of the bargain. And if we were to actually instruct the jury on how to decide that, it would have to be instructed that it can take two primary forms, lies about the price and lies about the characteristic of the good. And I think what's particularly telling on the question of the jury instruction is that the defense entire thrust of this appeal is that the customers didn't receive the nature of their bargain. And yet, that nature of the bargain concept was not one of their requested jury instructions. And I think that feeds into the government's second argument here, which is why their requested instruction also failed at the third prong, which was that it wasn't an issue that substantially impaired the defense. Because the defense in this case was never a true tackle-off defense. In tackle-off, the defendants came to court in front of the jury and said, yes, it's true we lied about the relationship between these B-girls and the bar owners. But once customers came to the bar, something different happened. The defense in this case was never that the defendants did tell lies, but those lies were somehow different than the nature of the bargain. Their defense was simply not a tackle-off defense. And that's why the decision not to give that instruction was not an abuse of discretion. Could you address on the sufficiency of evidence in the tackle-off issue? One concern I guess I have on the government's case here is that it looks like, just from my reading of the record, that the defendants made some efforts to distance themselves from this organization. Basically, the people that they were buying ads on their sites. What could they have done besides what they did, I guess, to avoid being tagged with the statements that was made on those sites? Your Honor's question goes, I think, directly to their arguments about sufficiency and is an aiding and abetting question, really, because we presented the defendant's role with Terry K. or Keller as aiding and abetting those lies. The evidence here showed that the defendants were appearing on conference calls with Keller, where Keller was talking about the revaluation and the defendants were talking about the airports. So for starters, they could have avoided making those appearances that implicitly endorsed what Keller did. They also were paying Terrence Keller while Keller was feeding back to them constant reassurance that I'm pitching you guys, I'm selling you guys behind the scenes, and they would respond saying, thanks, Terry, you're great at what you do. We appreciate what you're doing. Now, they could have responded, that's not what we're paying you for. Please don't do that. We are at arm's length. For instance, if the defendants had operated simply like a bank that was merely exchanging currency, there would not be an aiding and abetting argument here, but the defendants did not have an arm's length relationship with Keller by any stretch. They followed what he did. They endorsed him both implicitly and explicitly, and Keller absolutely endorsed them, too, and they were happy to sit back and let him do that because they knew that Keller was funneling tons of sales their way. And Keller displayed their ads. They were paying him $4,000 a month, right? Absolutely, and at the same time that he displayed their ads, he was affirmatively telling his listeners, you should go to Sterling to buy your dinar. Yeah, but I guess that's, and maybe this is not as complicated as I'm making it out to be, but, I mean, if they were a bank and they were a, I mean, they're the most legitimate business in the world, right, that sells dinar and sells other defunct currencies. They're a defunct currency business. Wouldn't they advertise somewhere to run that business? I mean, there's a demand. There was a demand out there for this currency, and so I'm just trying to figure out what, is the government's position that just basically anybody selling this currency has committed fraud? Absolutely not, Your Honor. Only people who are telling lies about the revaluation, either directly or indirectly, are. That benefits the defendants and the defendants who know about it. Absolutely, and who are aiding and abetting in the lies of others in doing so. And if the extent of the relationship was simply that there was a banner ad posted on a website, the lies about Terry K. would not have been connected to the defendants. And, of course, on a sufficiency review, we look at the evidence in the light most favorable to the verdict and draw all reasonable inferences in the favor of the verdict here. Here there's certainly evidence that Sterling was both implicitly and in doing so was liable for Keller's lies as well. On the issue of false statements, again, this is a sufficiency review, and we think that there's no doubt that the record establishes that the statements made by defendants were unambiguous. In the case of Mr. Rehm, the statements at issue for counts 31 through 34 were hell no, absolutely not, no way, and not in a million years. You argue that the questions have to be fundamentally ambiguous for the answer to also be ambiguous. Is there any case law that goes the other way? Not in this circuit that I was able to find. There is one 11th Circuit case that cites an 8th Circuit case that suggests that prosecutors may need to rule out innocent explanations, but it doesn't actually adopt that 8th Circuit finding. It simply cites that case and then distinguishes it. But this court doesn't even need to get to that question here because there's no arguable ambiguity whatsoever, let alone fundamental ambiguity, in the answers that are at issue here. In the case of Mr. Bell, his answers were, well, they complained about his use of the word firewall and that he said, we maintain a firewall between us and those guys. But in Bell's own follow-up statement, he explains exactly what he meant. He said, I tell them your job is not to drive business to my website. He is explaining what he meant right there. And likewise, in count 36 for Bell, the statement, I told him, referring to Keller, I don't want him doing it and I don't want to hear about it, that was in response to the agent's question about whether chat rooms were directing business to Sterling. There's no credible contention that the statements drive business or direct business are ambiguous in the context in which these questions occurred, let alone fundamentally ambiguous. And of course, the jury here was instructed that they could only convict on false statements if they found that the defendants made statements that were false and that was defined for them as a statement being false when it is. If made, it is untrue when made. And the person making it knows it is untrue. So the jury was already instructed to that question and there's more than that. Turning to the issue of the evidence that was admitted in this case, first I'll address the video, the CNBC video. As the court pointed out, the video and the other exhibits at issue here, none of them were things that the government scoured the Internet for and simply popped in front of the jury. Well, the Hue No Video seems to me to be very prejudicial. And the district court gave a limiting instruction, but as we know, a limiting instruction isn't always sufficient to cure the prejudice. And your opponent says that only Mr. Bell actually was aware of that video. And yet, well, the evidence supports that. And so the video in that case came to light because somebody sent Mr. Bell a notice and Mr. Bell responded, I heard about this, thanks for the link. And that was the government's contention of how we knew that Mr. Bell had seen the video because he said, I heard about it. You couldn't tell what it was just from the link. The only way someone could have known was by looking at it. The video in the Huebner video was highly probative, which is the first question the court needs to look at in doing a 403 balancing analysis. The reason it was highly probative is because on the video, it talked about the fact that Brad Huebner, who was a former Sterling customer, a former Sterling reseller, had told investors that the dinar would skyrocket in value. Huebner used weekly conference calls to disseminate that information. And there was even mention of using Wall Street sources that were fake. That whole scheme was remarkably similar to the scheme that Mr. Bell was involved with here. And particularly where- But doesn't that make it more prejudicial? Well, I think there's a difference between the probative value and how prejudicial it is. So there is some inherent tension because obviously all evidence that is bad for the defense is prejudicial to the defense. And so here, no doubt that this evidence was highly probative because it related to a very similar scheme. The question is whether it's unduly prejudicial. That's exactly right. And here, you have the defense, one of their primary defenses was that they were acting in good faith. And that, in particular, makes it all the more relevant and probative that the- The district court gives a limiting instruction. What does the limiting instruction say? So the limiting instruction here was actually quite extensive. It was the district court instructed that the video should not be taken for the truth of the matter. It also instructed that the facts in one case were not relevant to the facts of this case. And it also instructed that if the jury were to find it, it should be considered only as to notice. And if the jury were to consider it relevant to notice, it should only be considered as to notice as to Mr. Bell. And the jury actually received a written copy of this instruction in addition to being read the instruction. And the district court asked the members of the jury whether any of them believed that they would have difficulty following the instruction, and none of them said they would. Prejudice we have to be concerned about is whether the jury considered it for an improper purpose. Precisely. In the light of that limiting instruction. And one reason that we know they did not is because the jury fully acquitted Terrence Keller. And Terrence Keller, of all the defendants, was engaged in the most similar conduct to the conduct described in the video as far as holding the weekly conference calls and having false sources. And so for that reason, we believe the defense can't meet their burden of showing that if there were any error, it would not have been harmless in this case. The Trullo case is directly on point here. That's an unpublished 11th Circuit case in which a defendant who was being tried for bank fraud sent back and forth a couple articles talking about mortgage fraud. He sent one to his fiancee, and then he sent another one just to himself. And the court found that there was no abuse of discretion in admitting those because they showed the state of mind of the defendant. And the court likewise found that the article's effect on Trullo did not depend on whether or not its contents were true. And we think Trullo is very similar to this case. Likewise, for the other exhibits that the defense mentioned, each of those exhibits was either sent or received from one of the defendants. The internet article that they like to refer to as the Nutrition Dude article, they discredit the content of that article, and yet it was Defendant Rehm who sent that article to Defendant Shaw. And so clearly, Mr. Rehm thought it was relevant and important enough to send it to his co-owner in the company. They had comments at least associated with some of these things where it says this isn't good or, you know, that sort of thing, right? Precisely. For the Bank of America Bulletin, Mr. Rehm forwarded it to Shaw with his budget line, this isn't good. And in the Forbes article, Shaw forwarded that one to Rehm, and then he also forwarded it to Mr. Bell with a statement, not great article. So, again, these are not articles that the government snatched out of a vacuum to prejudice the jury. These are articles that showed these defendants in the midst of a conspiracy were talking back and forth about very similar conduct. I wanted to turn next to the defendants' arguments about the sufficiency of the evidence as to Mr. Shaw. I think, first, it's helpful to step back and look again at the standards here for sufficiency. We are looking at the evidence in the light most favorable to the verdict, and to prove somebody guilty of conspiracy, it's only necessary to show that two or more people agreed to accomplish an unlawful plan and that the defendant knew of the unlawful purpose of the plan and joined in it. And here we have perhaps the most compelling evidence of that that I can think of, in that we have Mr. Shaw telling Mr. Rehm that he is concerned about making money under false pretenses and that he is concerned that the company is running an illegal operation, making millions of dollars in false promises. Those two emails, one is at Government's Exhibit 1, one is at Government's Exhibit 3. One of those is referring to the likelihood of the revaluation. The other one is referring to concerns about customers thanking Mr. Rehm for extending these layaway offers. So I think that's certainly evidence that Mr. Shaw understood the unlawful nature of the plan, and as far as him willfully joining in the plan. Yeah, can I ask you a question about that? So it just seems odd to me that those emails would be, because the emails are expressing hesitancy about what the corporation is doing, so it seems odd that they would be used to show a willing participation in illegal activity if they're expressing hesitancy about what's going on. I mean, what do you say about that? What those emails show, Your Honor, is an understanding and knowledge of what was going on. It was the other actions of Shaw that showed that he was participating. So, for instance, when Mr. Rehm sent Mr. Shaw drafts of the website, including statements on the website that said that the revaluation is, it is probable that the revaluation will occur, and Shaw signed off on the website, that's where Shaw's joining into the plan. Where Shaw is being copied by Mr. Rehm in emails to customers promising that airport locations will be opened within 24 hours of a revaluation, that's where Shaw is joining in. And, of course, Shaw is also taking steps to keep this company in operation. He's responsible for the banking relationships, and he's profiting tens of millions of dollars as an owner of this company. And so Shaw understood that the bloggers were driving business to the company. He understood that they were making rumors that went nowhere, and that's Government's Exhibit 241, where he is telling that to other, I believe it's a family member. Rehm at one point emails Shaw, this is where our business comes from, sending him an email about bloggers, that's at 510. So the bottom line is that Shaw knew that the bloggers were hyping the RV, he knew that they were driving business to Sterling, he knew that Sterling was promoting an impossible airport plan, and he was content to sit back and rake in the money that that fraud delivered. And under the standard for conspiracy as well as Pinkerton liability, that is more than enough to support sufficiency of the evidence as to Shaw. I believe I've addressed all the issues raised by the defense. If there are no further questions from the bench, we ask that the Court confirm the convictions. Thank you. Thank you, Ms. Prout. Mr. Chamigan, you've saved four minutes. Thank you, Chief Judge Pryor. Four points in four minutes. Let me start with the instructional error. The reason Ms. Prout is misguided here is because the instruction here was not just insufficient, it was affirmatively incorrect. The sentence that was given, the intent to defraud is a specific intent to deceive or cheat someone, usually for personal financial gain or to cause financial loss to someone else. That is an incorrect statement of the law, and apparently it differs from the instruction that was given in Ms. Prout's preferred case of Waters, which required an intent to deceive or cheat someone out of money or property. The second sentence of our proposed instruction, the first added sentence, was, quote, proving intent to deceive alone, meaning deception without the intent to cause loss or injury is not sufficient to prove intent to defraud. That is what was lacking. That is what was incorrect about the first sentence. And that was recognized when the pattern jury instruction was amended in 2019. And the third and fourth sentences in our proposed instruction go on to focus on the nature of the bargain. And so while that phrase was not used, the instruction specifically talked about what they, the parties to the transaction, asked for. And so the jury was not told in any way to determine what it was that the customers bargained for here. Now, Ms. Prout says, well, you know, when you look at some of the e-mails and communications concerning the exchanges, they suggested customers would get priority. That is a factual issue, and that sort of sounds like an argument that the instructional error here was harmless. But the government has not made a harmlessness argument in so many words. And I would submit that the reason why the government hasn't done so is because if the instruction was incorrect, as the amendment to the pattern jury instruction pretty plainly indicates. So your argument is by not including what has been added to the pattern jury instruction, that makes it incorrect. No, that is not our argument. Our argument is that that single sentence is an incorrect. Because it's incomplete. No, not because it's incomplete. Because it is incorrect. Because it uses that word usually. Because it says that an intent to deceive or cheat someone is enough. And the reason why that is critical, Chief Judge Pryor, I would submit, is because the burden here with an incorrect instruction is harmlessness beyond a reasonable doubt. And critically, among other things, and again, this is why the government isn't arguing harmlessness. One of the government's core theories, as we point out in our brief, was that the fraud here was the concealment of the advertising relationship between Sterling and the Get team. That is an argument that the government has now abandoned. And so, again, our submission is that if the jury had been properly instructed, it could have considered the issues we've been discussing today about the scope of the bargain, what actually was bargained for. The jury was not given the opportunity to do so. Just to cover my remaining three points in my remaining minute, and I'll talk very quickly, on the issue of false statements, we did not hear from Ms. Powell a clear and crisp articulation of why the government thought that Mr. Bell's statements were false. And at a minimum, absent that, the government failed to bear its burden, even if these statements were not fundamentally ambiguous as a matter of law, to negate the contrary interpretation that we have offered, which this court's decision in white requires. On the Huebner video, all I would say is I would invite the court to watch the video. It's Government Exhibit 709A. It can judge for itself the highly prejudicial nature of that. And fourth and finally, I would just say one thing about the government's theory here. This is a very odd case. This is not the lottery ticket. These dinars were not worthless. If you look at Defense Exhibit 499, they remained level during the period of the alleged conspiracy and, in fact, went up modestly during that time. Instead, the government's theory seems to be that what took place here was that the defendants encouraged Mr. Keller to tell lies about the revaluation. They did not do so. There is no evidence of that. They merely advertised on the website. And so, in conclusion, I would say— We'll look at the record, Mr. Sham, again. Yes, this prosecution was motivated by the government's distaste for the fact that defendants were selling lottery dinars, and we would submit that it should be reversed or revalidated. Thank you. Thank you. We'll move to our second case.